17-1044, Mr. Sample and Mr. Cerruti. Good morning, Your Honors. May it please the Court, Brandon Sample for the appellate, Brotis Umana. With the Court's permission, I'd like to reserve two minutes for rebuttal. That's fine. I want to focus on two issues today. First being the District Court's conclusion that its loss calculation underestimated the total loss given the testimony of the government's witness that it had no evidence of other fraud. Second, the District Court's failure to apply the appropriate burden shifting framework for determining actual loss where defendant asserts that legitimate services were rendered. Let's assume under any burden framework, what evidence did Umana provide of reimbursable services that were rendered to Medicaid? Is it Medicaid the victim here? Yes, Your Honor. So what evidence did she put of reimbursable services that were rendered to Medicaid? We have a concession in the case, Your Honor, that approximately $125,000 worth of services were in fact reimbursable. Now the government sought to make up the loss of that $125,000 in the total loss figure at the evidentiary hearing by introducing additional evidence. And to Umana's position that the government's concession had approximately 10% of the overall total loss that was in the case, that the concession shows that she satisfied her requisite burden of production. Tell me how that was a concession. The government considered the Gluttony Report, which was an expert report that Umana offered. And after reviewing that, the government determined that, agreed with the report, that its calculations were incorrect. How does that answer Judge Ambrose's question? The government did concede two points of error. It also alleged that there was this additional $190,000. It put forward evidence of that. The district court concluded, using the proper preponderance standard, that that was satisfied. Isn't it at that point to show offsets, to show that you weren't a credit, the burden then on you as the person in the best position to demonstrate to the district court that legitimate services were provided? What is the evidence that was put forward of that to satisfy your burden? With respect to the total loss, the other things that were produced at the hearing, the court ultimately didn't find that evidence to be persuasive. And so it's our position in this case that, in terms of loss with respect to the victim itself, that it's kind of viewed as a continuum. So it's loss as a whole. And you have to take into consideration that this concession that the government made, that a portion of that was incorrect, would be almost the same as if she would have put that evidence on at the hearing. If the government had not conceded at the beginning of the hearing, they would have put that evidence on and the district court would have concluded that $125,000 was wrong, then I think it would be clear that she would have shown that there was some legitimate services that were rendered. I think the distinction, because a government concession was made, that somehow suggests that she didn't show that there were, in fact, some legitimate services rendered. But isn't there, weren't there two audits here, and then the first audit was the one that was in question, and then there was a second audit done, and there were no concessions by the government that there was anything wrong with the second audit? That is correct, Your Honor. Our position with respect to that is, in the context of loss, that it is discrete to each victim. As Judge Ambrose noted, that here the victim is Medicaid. And so if we look at loss and the defendant's burden of production with respect to that, once the defendant was able to show, via the government's concession, that a significant portion of what the government was asserting was wrong, then she satisfied her burden of production such that the burden then shifted the government for it to demonstrate its ultimate burden of persuasion and what the total loss was, including consideration for legitimate services. Where does the opinion in Bryson, or Bryant, excuse me, say what you just said, that there's one burden and then it shifts? Your Honor, Bryant does not speak to the burden of productions. In fact, Bryant is concededly a difficult case for us to be able to overcome. When you look at Bryant, it states that it's the defendant's obligation to prove the offsets for legitimate services. Now, it's our position in the case that because the defendant there did not put on any evidence at all whatsoever, there wasn't a government concession at all in the case, that when the court is really talking about proving the offsets, that what it's referring to there is the defendant coming forward with enough evidence for it to be able to satisfy its burden of production in that context, not necessarily that the defendant carries the ultimate burden of persuasion. When you look at the Second Circuit's case in Archer, which is not necessarily 100 percent analogous, they talk about the burden-shifting framework that the courts are so familiar with. But that's in the context of sentencing. We're in the context of restitution. And with Bryant and the way we've interpreted 3664E, we have that burden to show the offset on the party that is best positioned to show legitimate services were provided. That's the law in our circuit. Yes, Your Honor. So here, if I understand your argument correctly, it sounds like you're asking us to generalize from the fact that two points of concession were made by the government. They acknowledged two errors. That from that, with regard to the other evidence that they put forward to satisfy the preponderance standard, with some number already accounting for the deduction of those two errors, that generalizing a percentage of laws would satisfy your burden. I'm not sure why we would generalize to begin with or how that could satisfy your burden to show that the services provided were legitimate. Can you help me understand the argument? Right. Well, if the court interprets Bryant as holding that the defendant carries the ultimate burden of persuasion on the issue of credits against loss, then that undercuts our argument that we're making about there being this shifting burden framework where there's a burden of production. It's our position that even though the court found additional monies were applicable, that the government concession itself, though, in that general sense, though, is sufficient for the defendant to be able to satisfy its requisite burden of production. Because in the context of understanding the burden of production, it's not something, when you look at the other cases, albeit they are in the guideline context, but this court frequently, when we talk about loss, actual loss and things like that, it is typically almost interpreted interrelated and that it would be unusual to say that in one sense that under the guidelines when we are shifting the burden, when we look at Evans or we look at Ravens, when we look at a situation where the defendant needs to show that there's a tendency that the government's calculation is incorrect, we respectfully believe that taking the government's concession that approximately 10% of the total loss in the case before consideration of the additional monies that are also found is sufficient for a defendant to be able to show that they satisfy their requisite burden of production such that it would shift back to the government for them to meet their ultimate burden of persuasion. Just to clarify, given the stipulations in the plea agreement, the loss figures that you're talking about here only go to restitution. You're not challenging the guidelines. We made an argument in the appeal about the guidelines and the government has asserted that we've weighed that issue. You've got a plea agreement that covers that. That is correct, Your Honor. I come back to where I was at the beginning. Under any burden framework, I don't care what it might be, you have to provide for offsets evidence of reimbursable services rendered to Medicaid. And that requires two things. You maintain proper records with regard to each patient and you make them reviewable for state and federal authorities. And that wasn't done here. The government made an argument actually, Your Honor, about the record being so improper that claims should be denied in their totality. The district court decided not to resolve that question. And that was because the district court made a conclusion that the fraud in the case was so pervasive it did not need to resolve that issue. The district court also noted that there was some small amount of services that were probably legitimate, but it didn't need to resolve that either because the fraud in the case was so pervasive. But then that gets us back to the original problem that if we look at these two audits, as Judge Connie was pointing out, there's the MFCU audit, which was the primary focus of the evidentiary hearing, in that the government's witness testified that the government had no evidence of fraud outside of the six consumers that they had specifically focused or relied upon. And so if you don't have evidence outside of those six persons, then it's not possible for the district court to extrapolate that there is additional fraud. This is a dumb question. Then why stipulate that there was more than a million dollars of fraud with respect to guidelines? I realize it's not the Mandatory Victims Restitution Act, but why in a somewhat analogous situation stipulate to the amount of loss? Your Honor, I think that's a problem. The counsel who negotiated the plea agreement included that. I can't speak to their decision to do so. I think that it does undercut the stipulation itself, but we are stuck with that for the purposes of this appeal. And why there, going back to Judge Connie's question earlier, why there doesn't the state audit come into play? That is, that there is a reasonable basis for the district court to conclude that the fraud was so pervasive, even beyond those six patients, because the other audit also found pervasive fraud and did not overlap. Well, in the other audit, though, Your Honor, the government has asserted, actually, it is in their brief at 11 that that figure, the other audit, it's conclusively established as being about $550,000. That's not at issue. That's it. No more. So we have one audit where we have about $550,000, and then we have the other audit where there's the six consumers that they focus on, and then a government witness who testified that there is no additional fraud in that specific audit. So where does it come from? That's the issue with respect to the district court's finding about underestimation. Well, the federal experts say that she didn't look beyond the records of these six patients. But, again, given that there was a separate state audit where they did look at other medical records and found problems with the recordkeeping and fraud in those records, doesn't that provide a sound basis for the district court to conclude that, even assuming that there were some legitimate services provided, that the government's number was an underestimation loss? Your Honor, it's our position there's two audits. They have the initial audit where there was a set figure that the parties in the government have now agreed that that figure is locked in stone, not changeable. And then we have the other audit where it was extensively argued about at the evidentiary hearing, and the government's witness said there's no other fraud. That's our universe, nothing else. With that, I'd like to reserve the limited time I have for rebuttal. All right. Thank you very much. Mr. Cerruti? May it please the Court, Stephen Cerruti on behalf of the United States. I'll lead off with a point that Mr. Sample finished off with, first with a couple of, I believe, corrections. One, I don't believe the district court said or had any sort of finding that there were legitimate services. It simply said there may be some small amount of limited services, so a potential, not a proven existence. Second, Otter Blinkus, whose testimony Mr. Sample just referred to, never said there is no evidence of fraud in the other 144 clients out of the 150 that were looked at in the expanded investigation. She simply said, we didn't have documentation from which we could determine whether there was fraud as to those 144. And that's an important distinction, particularly given what the district court did here. But she then went on to say that likely this was a significant underestimation of the actual laws, correct? Yes. Should she have said that? Should she have? I mean, you need to show actual losses, do you not? And not estimate. In the restitution context, if it is possible to show actual losses, yes, that is the best practice. And here it probably was, was it not? It would have brought more digging. It would have taken a lot more digging, and given the nature and the pervasiveness of the fraud in this case, and the fact that you really have a bunch of documents, as the district court found, that you couldn't rely upon to determine exactly what potential offsets there were or not. I don't know, and this never really came up in the district court proceedings, so I don't think either party took a hard position on it. I don't know that actual loss would actually be potentially discoverable in this case, given the facts. And so what the district court in making that finding and saying, okay, if you want to try and nibble around the edges. You mean the facts that the records were not good and there was not good reporting, or what? Well, I mean, you could certainly determine they could have looked at the other 144 clients, pulled the documentation, see if they were the same problems that were with these six that they looked at. But then if you move on to the issue of offsets, which is basically what Ms. Amana is hanging her hat on here to try and lower that restitution figure, then what is she going to be able to put forth to prove those offsets? Our position is, and as the court has kind of expressed some questions about that to opposing counsel, that evidence was lacking as to the six. I don't believe there's any reason to believe that the evidence would be any better as to the other 144. And to Judge Krause's questions regarding the BFO audit, yes, it's true. We do not contest the ultimate findings of the BFO audit as was agreed upon by the parties. But if you do look at that BFO audit, they did look well beyond just the six individuals in the expanded investigation, found some levels of fraud with regards to many, many dozens more individuals. And so given that and the pervasiveness of the fraud with the six included in the expanded investigation, it seems eminently reasonable for the court to say, okay, well, even if there may have been some other offsets, I don't think that you proved those, but there may be offsets. Those would be overwhelmed by the likelihood of additional fraud outside of those six. I'm pushing time. Why were there two audits here? There was one by what, the DHS? I'm sorry, HHS, I guess. BFO and then MZFU. Yes, there were two audits. And why indicate fraud under, I guess, DOJ? They certainly assisted with it, but I think it was still, the actual investigation was conducted primarily by state investigators. Okay. I'm afraid I don't know the answer to your question as to why two separate ones were done. And the AUSA who was involved is now a judge elsewhere, so I don't know. I can ask it very easily. Does the government dispute that there were some legitimate services provided? There is, there are certainly statements that were made during investigations that individuals may have been over there who may have, or helping the clients who may have provided some services. But, you know, there was no evidence in the record presented talking about the extent of those services, what those services entailed, whether, you know, they were LPNs versus not LPNs. That was all evidence that Ms. Umana was in the best position to produce if she wanted to prove that fact. Do you agree that the burden is ultimately, the burden of persuasion remains on the government to show actual loss? Well, I think under Bryant, because it talks about proof in general, and Judge Ambrose, since you wrote Bryant, you might be able to clarify this for me if I'm wrong. I think that there is a discussion there that's being… It's all a fog. That's okay. You can certainly read that to say that there is the burden of persuasion on the defendant, and given the statutory burden shifting that is allowed under the MVRA, it can be proper for the district court to place that burden on them. Our position, though, ultimately would be you don't necessarily need to get to that question because we think that the district court here, while it didn't use the language of persuasion and production, ultimately found the problem was Ms. Umana didn't meet her burden of producing credible evidence that there were offsets. So I think the failure was here was failure to meet the burden of production, and we don't even get to failure to meet the burden of persuasion. But to the extent that the district court does rely on the idea that there was some underestimation of loss, taking your colleague's argument that the BFO audit, those figures are already set in stone, that that's accepted. And so what we're left with is there is the concession from the government's expert that she did not examine anything other than these six patients, and extrapolating from that, the district court is concluding that the loss is underestimated, so she's not going to go forward and examine any further whether an offset or a credit is warranted. The district court acknowledges the concern, saying that it's not engaging in unpermitted speculation, but then simply goes on to say that the court finds, based on the evidence presented during the loss series and basis of the fraud, that the loss figure is calculated by the government and understates the total actual loss. There's no specific evidence that is referenced or that seems to be available for that conclusion, other than those six patients' records. Why aren't we left with pure speculation? Well, I think the reason you're not left with pure speculation is you look at the criminal fraud enterprise as a whole, and you look at the fact that it was incredibly pervasive, not just with the six individuals that were focused on in the MFCU and expanded investigation, but you can look back at BFO. Again, we're not contesting the ultimate dollar amounts that were determined to be at issue in the BFO audit. I'm simply pointing out that what the judge knew, was aware of, is that that BFO audit found fraud well beyond the universe of just those six individuals, well into the other 144 clients. And so you combine the fact that there was pervasive, widespread fraud with dozens of individuals during that time period, and then the MFCU expanded investigation covers a period that begins a day later, one day later, and yes, focuses on six, and doesn't look at the other 144. It's reasonable to say that all the fraud with regards to those other 144 didn't just automatically stop at that point. And again, I think it would be very problematic if the district court were to say, okay, look, we think that there was 100% of fraud on these six individuals from the expanded investigation, so we're going to extrapolate that 100% and also calculate as part of the loss, the 100% of the loss on the other 144. But that's not what the district court did here. The district court did here just said, okay, we're trying to nibble around the edges with regards to potential offsets that you haven't proven, by the way, but nibble around the edges, that's likely going to be overwhelmed by fraud that's probably going on elsewhere. But ultimately, what did the district court do? It settled on a fraud figure, on a loss figure, and used that for restitution based only on those six individuals. It didn't base it on any of the other 144. And that's why ultimately, as I argued in the United States' brief, this is kind of an alternative argument put on top of what was implicitly the district court's real basis for avoiding what it did, finding that there was pervasive fraud as to these six individuals. They didn't put up evidence, credible evidence, that there were any offsets, and so therefore... But isn't the argument here for the defendant that the problem was with the audit itself? Because the audit itself was conducted so that if there was any fraudulent action or missing documentation for a month, they concluded that the entirety amount for that month was a loss, was an actual loss. But they didn't delve down into the specifics of all of the documentation in a particular month. They sort of took a shortcut. Is that not accurate? I think that might have been the case in some instances, but I don't think overall. And particularly when you had, and I believe it was, again, Auditor Palinkas who testified to this at the last hearing, for a Medicaid award to be made, you have to meet the various standards. And as soon as standards cease to be met, you fail. That was an argument that we made to the district court. The district court decided, well, I don't need to address that. There would be an alternative basis here. So you're saying the standard would be that if there was one problem with documentation being fraudulent in a particular month, then for the entire month that's unacceptable and we can look at that entire amount as a loss. It's a combination of some of it being fraudulent, and then as I broke it down in the brief, because Auditor Palinkas did as well, it's a combination of there's fraudulent documentation and then there are claims for which there is no supporting documentation. And either way, that's problematic. If there was legitimate documentation, credible documentation that services were provided, I don't think that would have been included in the loss amount that was calculated as part of the audit. I think that's what they did. They didn't delve. At least that's the way it appears from the record. Well, I think they looked to see if there was adequate documentation for their purposes. And if they say that there isn't, then that's where they have a problem because they will not pay unless certain documentation standards are met. And that is, of course, then why when you have a situation like this, you do have the shifting burdens. The opportunity is there for Mizumana in this case or other defendants to then come forward with that documentation and have the court look at it. But they didn't do that here. If we're concerned that the district court may have thrown the towel too quickly in trying to evaluate whether you look at it as actual loss on the one side or the amount of the offset on the flip side of that, and the extent to which the district court may have been relying on the idea of an extrapolation from the six patients, should we remand for clarification from the district court about the basis for the loss figure? So I think the court, again, while maybe not as explicit on some of these ideas as we might like, nonetheless the decision was adequate, implicitly addressed the kind of burden-shifting framework that we talk about here, and did look at the evidence that was produced and the testimony of the one witness that they called at the loss hearing and said everything you relied upon was non-credible, and there was a basis for that. So I don't really think that there is a need for remand for further clarification, but ultimately that's your decision to make.  And when the government has found it almost impossible to validate the amount being claimed because there's so much fraudulent documentation and unreliability of the documentation that the government can't parse it out, is that the standard? So it is an approximation? Well, the standard we would encourage is that in Joan's case I cited in the brief, which is to say that when you have a Medicare provider who knows the standards that are supposed to be met for documentation, the government can beat its burden by showing that either the documents that are produced are fraudulent or that none of that documentation was provided. That's enough. And then if they want to prove offsets, it becomes the defendant's burden to prove through credible evidence that, yes, we did provide services. That would be our position. It's not that the government gets to just throw up its hands, but the government can point to the fact that there's no documentation for prima facie evidence that these are improper claims. Thank you very much. Thank you. Mr. Sample. I believe that this case should be remanded to the district court for at a minimum clarification of the issues that the court has identified. I don't want to make it seem either, going back to some of the original questions, that the only thing that Ms. Romano did or is relying on here is the concession that the government made. She did put on extensive evidence at this evidentiary hearing. She put on an expert. She cross-examined the witnesses. But didn't the district court find that the expert was not credible, that there was no basis for the opinions that the expert was giving and therefore discounted entirely that testimony? That is true. I think that does stand somewhat in contrast to, and not to come back to the concession, but there was a concession from the same expert by the government that a portion of the government's officers were wrong. But there was also significant testimony that was elicited on cross-examination from the government's auditors about these substantial periods where we had persons on behalf of Umana's business that were actually going and providing services. And then the district court ultimately never resolved this question that the government continues to posit about entire claims should be denied because maybe a portion of it is wrong. The district court didn't resolve any of those issues about legitimacy. Is that a question of law that we can determine? I believe that the district court should be given the opportunity to address that in the first instance. And for the reasons that are adduced in our brief and the argument herein, we would encourage the court to vacate. But when a district judge makes a credibility determination or a determination with regard to the facts presented by a particular witness, who are we to intervene and say that that's wrong? Asked prior to the court would not do that. Thank you very much. Thank you to both counsels. Well presented arguments and we'll take the matter under advisement.